## Case No. 11,271.

### POOLE et al. v. The WASHINGTON.

### STURGES et al. v. The MAZEPPA.

[9 N. Y. Leg. Obs. 321.]

District Court, S. D. New York. April 9, 1851.

COLLISION—VESSELS FREE AND CLOSE-HAULED—RULE AT NIGHT—LOOK-OUT ON LEAVING PORT—PLEADING—STATING MATERIAL FACTS.

1. In admiralty pleadings the court requires that material facts within the knowledge of the parties should be distinctly stated, and a neglect in this respect is to be taken most unfavorably against the vessel omitting it.

2. The general rule that a vessel free, meeting one close-hauled, must give way, whether the close-hauled be on the larboard or starboard tack, applies in all cases where the facts are not doubtful as to how each vessel has the wind.

[Cited in The Catherine and Martha, Case No. 2,512.]

3. During a dark night, or under circumstances making it doubtful which vessel has the wind free, the larboard tack must give way in time, the starboard tack being regarded as privileged, although it may turn out that she had the wind some points free.

4. Where a practice was set up and a proof given, that on board vessels, more especially coasting schooners, no look-out was stationed exclusively to perform that duty when leaving the port of New York during daylight, but that all hands were on deck and were considered as sufficiently performing that duty among them.

_Held_, such practice to be without law or reason, and that no practice can be more hazardous and reprehensible; that it is most pre-eminently and imperatively the duty of all vessels on leaving this port at all times to observe the precaution of a vigilant look-out.

[Cited in The Ancon, Case No. 348.]

5. The want of a look-out, detailed and stationed for the exclusive performance of that duty, was itself a circumstance of a strong condemnatory character, and exacted, from the vessel neglecting it, clear and satisfactory proof that the misfortune encountered was in no way ascribable to her misconduct in that particular.

[Cited in The Northern Indiana, Case No. 10,-320.]

[These were cross libels by William S. Poole and others against the schooner Washington, and Lothrop L. Sturges and others against the bark Mazeppa, to recover damages sustained by a collision.]

Robert Emmet and W. Q. Morton, for the Mazeppa.

F. B. Cutting and E. H. Owen, for the Washington.

BETTS, District Judge. It is evident that the subject of controversy brought before the court in these suits was regarded as important in itself, and also as affording strong grounds of claim to each of the parties, as cross actions were instituted nearly simultaneously and have been both pursued with great earnestness to a final decision. The schooner Washington, on a voyage from New York to Alexandria and Georgetown, District of Columbia, and the barque Mazeppa, from New Orleans to New York, in the afternoon of September 15, 1848, came in collision, twenty or twenty-five miles southwardly of Sandy Hook, and some miles off the Jersey shore. The day was bright and clear, and no object intervened to embarrass the movements of the vessels, or intercept a distinct view of each other. Both received serious injuries from the collision. The Mazeppa lost her foretopmast backstay; was cut down a little farther aft within two feet of the water, which washed in; had her mainmast shattered by the bowsprit of the Washington; was nearly stripped of her starboard bulwarks from aft of the foreshrouds; starboard main-shrouds carried away; poop deck lifted up; cabin injured; stern boat knocked away; and from the tottering and dangerous condition of her mainmast it had to be cut adrift. Her anchors were let go at once; a pilot boat rendered salvage service; and the Mazeppa was towed to the city on the following day by a steamboat. Libels were filed against the Mazeppa for salvage on behalf of the pilot and steamboat, and the sums paid on their settlement claimed as part of the damages against the Washington. The Washington had her bowsprit broken short off; lost her figurehead, and was otherwise seriously injured about the bows; she continued her voyage, however, to Georgetown.

The owners of the Mazeppa filed their libel

against the Washington, on the 30th of September, to which an answer was interposed on the 9th of November following. On the 16th of the same month the owners of the Washington commenced their action against the Mazeppa, and the answer to that libel was filed the 5th of December thereafter. The cross actions were brought to hearing at the same time upon the double pleadings, and proofs taken in them conjointly. The owners of the Mazeppa pleaded that she was close-hauled on the larboard tack, the wind W. N. W., inclining to the N., and blowing a whole-sail breeze; and that the Washington, headed S. S. W., being to leeward of the Mazeppa, with all sails set, and running at least four points free, the wind abaft the beam, at the rate of nine knots the hour, struck the Mazeppa on her starboard and lee side abaft the fore-chains, and charges the damages incurred to be $10,000, besides salvage paid, &c. They charge that the collision took place three to five miles off shore, in full daylight, and was occasioned by the negligence and want of skill of those navigating the Washington, and the want of a proper and vigilant look-out on board her, and aver it was impossible for the Mazeppa to have done anything after her danger was discovered to avoid the Washington; that those on board the Mazeppa expected the Washington, in obedience to the rules of navigation, would have taken seasonable measures to avoid the Mazeppa. The owners of the Washington pleaded that the Washington was sailing along the land about one and a half mile off, as near thereto as was prudent or customary for vessels of her size and draught of water to go; steering by the compass S. by W. or thereabouts, the wind blowing a fresh breeze from W. with frequent squalls, in which it would vary a point or two; that she was under whole mainsail and foresail, standing and flying-jib and no other sail, and the mainsail and foresail were about a point off from being close-hauled, and she was going about seven knots. They charge that the weather was clear, so that objects could be seen at a great distance, and that the Mazeppa was to leeward and ran across the track of the Washington, the collision occurring between 3 and 4 o'clock p. m., and that it was impossible for the Washington to avoid it; the Washington did not any way change her course previously, and that the Mazeppa, by luffing or keeping away in time, could easily have avoided the collision, and charges the want of proper care and diligence in the master and look-out; the look-out not giving the pilot notice of the Washington till the two vessels were close upon each other, and allege the collision was occasioned solely by the fault of those on board the Mazeppa; and state the damages received by the Washington at $3,000 and more. They aver the master, his mate and three men were on deck and kept a proper look-out, and such as is usual to keep in the day time in fair weather.

The counter-pleadings introduce a multitude of particulars with a view to show the blame of the misfortune was imputable to the adverse vessel, but they consist rather of amplifications and inferences than allegations of any substantial points for proof or decision, and belong more to the province of argument than that of pleading. So far as they may be regarded as having a material bearing upon the merits of the case, they are noticed in the course of the decision, and it is unnecessary to spread them further on the statement of the case. The material issues involved in these pleadings are: Whether a proper look-out was stationed and kept on both vessels or either. Whether both vessels were close-hauled upon the wind, or if either, and which had the wind free; and to this inquiry, whether the wind was W. directly off shore, or W. N. W., including more N., the wind was W. directly off shore as the two were approaching each other. What was done or omitted on board either vessel immediately preceding the collision evincing the want of due precaution and skill. Upon these several points the statements in the pleadings are directly in conflict, each vessel representing itself in each particular wholly in the right, and the other one wholly in the wrong. The pleadings on each side are sufficiently full and precise, except that the Mazeppa fails to aver the course she was steering. The testimony adduced by her shows she was laying N. half E., but both in the libel and answer filed on her part, this particular is left unstated; it is only alleged, she lay close-hauled to the wind, blowing from W. N. W. tending more N. On the other hand, the Washington sets forth distinctly in the pleadings her course by the compass. This is the proper method of pleading. The court has a right to an unreserved and explicit statement on the pleadings of every fact known to the parties, which may be material to the maintenance of the case set up by them respectively, and it is thus not unfrequently enabled, upon the mutual representation of the positions and manœuvres of the two vessels, to ascertain whether the conduct of either was blamable, and if so, with which the fault lies. The neglect to supply this guide to the judgment of the court is always to be taken most unfavorably against the vessel omitting it, and the court will be cautious that such reserve shall not be used in her behalf to the surprise of her adversary, or so as to permit proofs to be shaped to meet any description of case she may find it advisable to set up on the trial. This point is not without materiality, for it is denied on the part of the Washington that the Mazeppa was holding a proper course, if she was in fact running close-hauled, and it was accordingly proper that she should have made a specific averment

on that head, which should announce the ground of her justification, and enable the Washington to meet it with the appropriate pleading and proofs, and the court be supplied a direct issue to decide upon. But as no exception was taken by the pleadings or in the course of the trial to this defect in the allegations of the Mazeppa, and as testimony was produced against her tending to show she was steering W. of N., I think it may be allowable and proper for the court to consider the evidence on both sides to this fact, although it is not formally put in issue by the pleadings.

Some of the issues raised present no questions important to the merits of the case. For instance, it is not shown to be of any consequence to the rights of either vessel whether the collision occurred 20 or 25 miles south of Sandy Hook or 1½ or 5 miles off the shore; for the evidence, so far as it applies to those inquiries, tends to show that at the time the wind was the same at all those points. It may occasionally happen that a current of wind runs up or down along shore, which is not felt in the same direction some miles from land, and that a change of wind is experienced soonest five miles nearest to the point at which it settles; but the clear bearing of the evidence in this case is that during the period embraced within the transaction in question the wind was felt from the same quarter at all the different places set up by the parties as the point of collision. The disagreement in the proofs to be settled by the court relates, therefore, solely to the question whether it blew directly from the W., or from W. N. W. inclining N., because all the witnesses in a position to speak to this fact at the time of the collision limit their testimony to the course of the wind then and there blowing. The chief discordance arises from varying estimates of distance from other places, in which the two vessels came in contact.

The maritime rule of law applicable to sailing vessels meeting under the circumstances stated in the pleadings is differently understood by the counsel for the respective parties. For the Washington, it is contended, that the vessel if running close-hauled with her starboard tacks on board, is entitled to hold her course when there is sea room sufficient, against another approaching her in a direct line, or on a parallel line so near as to endanger a collision, and that in either of such cases the vessel on the adverse course must give way, and they insist that the privilege is preserved to the starboard tack, although running free. The authorities referred to do not support the proposition in so general a form as it is put and maintained by the argument. Ang. Carr. § 654, gives the summary of the doctrine as he gathers it from the cases, and he annexes to the principle the important qualification that the starboard tack so situated retains her course in doubtful circumstances.

The case from which the proposition is extracted affords very little countenance to any idea that the old rule was intended to be changed by extending the privilege of the starboard tack beyond what had been always recognized in the established usages of navigation. In that case the vessels met in the night time, and it stood doubtful upon the pleadings and proofs which had the wind, and it appeared they were standing towards each other head and head, or nearly so, and that, when the starboard tack ported her helm to avoid the other, the larboard tack ported hers also; thus bearing up again into the same track with the other. There were here a duplication of faults by the larboard tack—First, as it was unknown which vessel had the wind most free, it was her duty to have given way to the starboard tack; and, second, after the starboard tack had adopted that measure herself, and had taken a course which would have carried the two clear of each other, the larboard tack bore up in the same direction, thus producing the collision, which could have been avoided had she held her course, or done what was, in doubtful circumstances, incumbent on her, kept away. The Ann and Mary, 2 W. Rob. Adm. 189. That case, moreover, must always be followed with great caution, as in a suit at law for the very collision a verdict and judgment had been rendered against the owners of the vessel on the starboard tack, fixing the blame on her. The comments of the Trinity masters appended to the case, and not adopted in its decision, can have very little weight in proof of the usage or customary rule of navigation, because the testimony of other Trinity masters, offered to prove the usage to be otherwise, was rejected by the court; and if their remarks were intended to cover the case of vessels running free, or nearly so, they will be found in conflict with the general course of decisions in that court. The observations of the Trinity masters most probably were meant to apply to vessels beating against the wind.

The case of The Traveller, also cited on the part of the Washington, brings out more distinctly than The Ann and Mary the doctrine alluded to in the terms employed by the court in pronouncing its opinion, for it is declared the duty of the larboard tack to give way at once when there is a probability of a collision; and this it seems she must do, although the starboard tack is a point or two free, and as much to leeward. 2 W. Rob. Adm. 197. The qualification of peculiar circumstances is, however, applied most distinctly to the doctrine, for in that case the vessels met in the night time, and each insisted her position was to the windward of the other. The course of the wind, and her own direction as claimed by each vessel, would put her close-hauled. They were running in opposite directions. One alleged she was steering S. with the wind W. S. W.: the other, that she was going in a northwesterly

course, the wind being W. by N. to W. N. W. The larboard tack was accordingly placed in a situation when, in the night time, it was incumbent on her to take seasonable precautions against the chance of an encounter with the vessel approaching her.

This review of the special grounds upon which the decisions in The Ann and Mary and The Traveller were placed relieves the cases of what might at first seem to be a conflict with the doctrines declared by the same court in previous judgments, and which have been adopted and approved extensively in the courts of the United States. From the time of the decision of The Woodrop-Syms, by Sir Wm. Scott (2 Dod. 83), to that in the two cases referred to, the rule in relation to sailing vessels has been uniform that the one running with the wind free must take measures to get out of the way of one approaching close-hauled on the wind, and this without regard to the fact whether the close-hauled vessel is on the starboard or larboard tack; and this is the rule of the Trinity House Corporation. Abb. Shipp. 234, 235; Ang. Carr. § 652; The Chester, 3 Hagg. Adm. 316; The Celt, Id. 321; Westm. Rev. (Sept., 1844) p. 60. So in the American books it is said, a vessel sailing with the wind free must give way to one sailing on the wind; the privilege of the starboard tack applying where both vessels are beating to windward, and are crossing each other in opposite directions, and there is the least doubt of their going clear. Story, Bailm. § 611; 1 Conk. Adm. Prac. 305; Dana, Seamen's Friend, 84, 186. The rule recommends itself to a strict observance from its precision and simplicity, and because in the day time it can rarely happen, when reasonable diligence is exercised, that both vessels will not readily discover their duty and privilege under it. The rule does not, in terms, apply so strictly to vessels approaching, but not crossing, each other with the wind free to each, for in that case the law of navigation requires each to pass to the larboard of the other. Trinity Rules, No. 2. Yet the general law, when one of the approaching vessels has the wind fair, imposes on her the duty to give way to the other on a wind. Id. No. 1.

The facts in proof, brought within these principles of law, evince the fault to have been with the Washington, because if it appeared doubtful at the time on board her whether the Mazeppa was not running free with the wind abeam, it was incumbent on her, being herself so situated, to have put her helm a-lee, leaving the Mazeppa an opportunity to pass on her larboard side; and, even if she was close-hauled, as is contended in her behalf, she had, in my judgment, no privilege to maintain her course in the day time against the Mazeppa, also close-hauled, for both should in such case port their helms passing larboard and larboard, as upon her theory, neither vessel was beating, and they were not crossing each other. Westm. Rev. (Sept., 1844) No. 164, p. 60; Abb.

Shipp. 235; Lowry v. The Portland [Case No. 8,583]; The London Packet, 2 W. Rob. Adm. 216. And she might be required to give way from a privileged tack, when by so doing she could avoid a collision which was likely to occur from the larboard tack adhering to her course. The Lady Anne, 1 Eng. Law & Eq. 670. This view of the case necessarily defeats the claim of the Washington to damages, if it does not subject her to them, as her action cannot be maintained if she is guilty of any fault tending to produce the collision. The mere fault of the Mazeppa, provided it be shown she committed one, will not entitle the Washington to recover damages. There must be, on her part, due precaution, skill, and diligence; so that the injury could be no way justly imputable to her own misconduct. The action is founded upon the alleged correctness of her own conduct and the blamableness of the Mazeppa, and there must be affirmative proof supporting such posture of the case.

Again, upon the pleadings, there would be difficulty in the Washington maintaining a right to hold her course as a privileged tack. In The London Packet, 2 W. Rob. Adm. 216, Dr. Lushington interprets the rule of larboard and starboard tack to depend upon the presumption that the two vessels are directly opposing each other, and is not intended to apply where the heads of the respective vessels are lying in different directions. Such he asserts to be the case when one heads to the S. E., and the other is N. N. W. half W. It is obvious the courses differed only one and a half points from a coincident line. In the present case, the course of one vessel was N. half E., and of the other S. W., which would be the same deviation of a point and a half from coincident lines. The distinction is plain enough, perhaps, upon the compass, or in nautical arithmetic, but must be admitted an exceedingly close one for practical purposes, and does not seem to comport with the acknowledged law of navigation, which gives the privilege to the starboard tack close-hauled against the larboard close-hauled, when the vessels are crossing each others' courses; and would, moreover, seem not entirely accurate in its postulates, because the courses given must, if sufficiently protracted, cross each other. The same result is, however, obtained, whether Dr. Lushington's expression of the rule be adopted, or the more simple and perspicuous one of each vessel putting her helm a-port when the courses are upon or approximating to a common line, because in both instances the vessels give way, each passing to the larboard of the other.

In my opinion, a great preponderance of the testimony derived from witnesses not on board either vessel, and in situations to see and know the facts as to the direction of the wind, and the courses the vessels were steering, and their distance off the land, supports the case made by the Mazeppa, and contradicts that set up on the part of the Washington. It is satisfactorily proved that the two vessels were more than three miles from the Jersey shore

at the time of the collision, and that there was no impediment in the way of their free navigation. The atmosphere was clear, and the wind a whole-sail breeze. To the main particular in dispute between the parties, whether the wind was W., or to the N. of W., and about N. N. W., inclining still more to the N., the mate of the Washington, the man at her helm, and a deck hand testify it was W. The master and mate of another vessel, one and a half or two miles off, and running the same course with the Washington, and the master of a schooner, three miles off, going N., also support that testimony. The captain of the Washington was not examined in the cause. On the other hand, the pilot, master, chief mate, and five of the crew of the Mazeppa, including the man at the helm, all unite in asserting the wind was N. of W., and in this they are supported by two pilots who passed these vessels about the time of the collision, in charge of other vessels coming to New York, and by three other pilots who were in their pilot boat following the Washington down, and about a quarter of a mile from her at the time of the collision. The bearing of the testimony of the witnesses out of the Mazeppa tends to fix the wind at about W. N. W. to N. W. Their testimony furthermore corroborates that of the crew of the Mazeppa, that she was close-hauled and to windward of the Washington, and that the latter was running free, as were all the vessels in sight at the time going S. This evidence overbears in numbers and disinterestedness that which represents the Washington close-hauled and to windward of the Mazeppa at the time.

There would be no utility in extracting from the proofs the evidence in all its details. Every witness was subjected to the most careful and skilful examination by the counsel for the parties, and was led through the most minute statement of particulars directly or collaterally bearing upon the case. I did not at the trial discern, nor on more studying the evidence now do I find, reason for distrusting the intelligence and integrity of the witnesses. The discordance in their testimony is no doubt the result of misapprehension and mistake, but there is no reason disclosed upon the proofs which calls upon the court to adopt the statement of the lesser number, and reject that of the great majority of these witnesses. Accordingly, I feel bound to regard the facts testified in support of the Mazeppa, as presenting the true statement of the case in this particular, and that she was to the windward closehauled, and the Washington to leeward running two or three points free at the time of the collision.

This condition of things imposed on the Washington the obligation of proving that, notwithstanding her effort to keep out of the way of the Mazeppa, the fault of the latter had produced the injury sustained by her. The Mazeppa is charged with misconduct in not keeping a sufficient look-out, so as to be apprised of the situation of the Washington, and be able to take proper measures for avoiding her. This charge is supported by the evidence of Mr. Lothrop, a port warden, who testifies that about the time the Mazeppa came into port, he heard her captain and mate say, they did not see the Washington until she was within ten feet of the Mazeppa. The captain denies he made such declaration, and says he was called out of his cabin by the hail of the mate to the pilot, that a vessel was on the lee-bow, and as he came on deck he saw the Washington, then about ten lengths off. The mate had been examined on depositions out of court, previous to the trial, and was not present to be recalled after the testimony of Mr. Lothrop was given. He had sworn he was placed forward as look-out, and had seen the Washington a distance off, and had given the pilot notice of her, but it was supposed her then position and course would carry her entirely to leeward and clear of the Mazeppa. There is evidence tending to show that Mr. Lothrop had evinced a strong partizanship in the cause in favor of the owners of the Washington, and under that feeling had made charges derogatory to the character of the pilots examined as witnesses; and the court, under such a state of his mind, should exercise caution in allowing his recollection of casual remarks of the captain and mate to impeach their express and positive declarations on oath. This topic need not, however, be discussed at length. It is enough to say that Mr. Lothrop may have easily and innocently understood the assertion of the captain, that when he saw the Washington she was not more than ten lengths off, to be a distance of ten feet, and that she was then seen for the first time, and that kind of inconsistency, resting upon the memory of a mere word, could never be allowed in a court of justice to outweigh or discredit the direct and positive oath of a witness to a fact passing under his own eyes. I accordingly hold it proved that the mate was on the look-out and saw the Washington a sufficient distance off to enable the Mazeppa to avoid her, if it was her duty to do so, and that he and the pilot acted under the persuasion that the Washington was running a course, and at a distance off, which left the Mazeppa out of danger.

On the other hand, it is admitted on the part of the Washington, that she had no individual of the crew designated and stationed forward as a look-out, and that the Mazeppa was not seen until within two lengths, but it is asserted that the whole ship's company perform the duty of keeping a look-out. Evidence was given attempting to establish a usage with vessels leaving port, to rely upon the ship's company the first day out for that service, and not to detail and station any particular one or more to perform it. Such practice, so far as it exists, is without warrant of law or reason. The duty of a ship's company the day she leaves port, will probably be as absorbing, or more so, than on any other day of the voyage, in fair weather. Much must inevitably be left unfinished, in clearing the deck, stowing luggage or loose cargo, arranging or coiling

rigging, and various other services and necessities of the vessel, when she leaves her moorings, all which must be put in order by the crew as she goes out of port. No practice can be more hazardous and reprehensible than to leave the ship to run her course amidst the incoming and outgoing navigation crowding a harbor like New York, without the safeguard of a look-out properly stationed forward and assigned to that service, and instead of the first day being one on which she is exempt from employing that precaution, I hold it most pre-eminently and imperatively her duty to observe it with careful vigilance at all times. The want of a look-out at such time, is of itself a circumstance of a strong condemnatory character, and exacts from the Washington clear and satisfactory proof that the misfortune encountered is in no way ascribable to her misconduct in that particular.

Without discussing at length the facts in proof on all the points at issue, or determining whether the Mazeppa is proved to have run suddenly into the wind and against the Washington. I hold, upon the law and evidence of the case, that there was wrong and fault causing the injury, and that they lie upon the Washington, and the Mazeppa is entitled to recover the damages sustained thereby, and the Washington must be condemned therefor with costs. An order of reference will be taken to ascertain the amount of damages.